NEW JERSEY DEPARTMENT OF LABOR,
WORKMEN'S COMPENSATION BUREAU.

RAYMOND W. HULBERT, PETITIONER, v. WARREN FOUN-
DRY AND PIPE COMPANY AND/OR WARREN FOUNDRY
AND PIPE CORPORATION, RESPONDENT.

For the petitioner, *Gebhardt & Gebhardt.*

For the respondent, *Clarence B. Tippett.*

This is on a petition for compensation filed by the peti·
tioner, Raymond W. Hulbert, for the purpose of obtaining
additional compensation under the Workmen's Compensation
act of this state.

On January 31st, 1925, the petitioner was employed by the
respondent as a helper in a repair gang, and on that day
met with an accident in which his right arm and right leg
were so seriously injured that it was necessary to amputate
the former four inches below the shoulder and the latter
five inches below the knee.

Under section 11 (v) of the Workmen's Compensation act

*(Cum. Supp. Comp. Stat.* 1911-1924, *p.* 3874, § \*\*236-11 (v) the loss of these two members constitutes total permanent disability. Accordingly, the respondent's insurance carrier paid the petitioner compensation for this total permanent disability for the period of four hundred weeks at $17 per week, and then continued the payments at the same rate until April 20th, 1934, at which time the payments were discontinued by reason of the fact that the respondent claimed that it was no longer incumbent upon it to make further payments. Sometime thereafter, the petitioner filed this petition for the purpose of obtaining further compensation.

It also appears that no compensation has been paid in this case for the temporary disability sustained by the petitioner.

The rehabilitation commission of New Jersey undertook to rehabilitate the petitioner and sent him to Churchman Business College, in Easton, Pennsylvania, for the period from March, 1932, to April 20th, 1934. At this institution the petitioner took certain courses designed to fit him to do general clerical work. He was somewhat handicapped because of the fact that his previous education did not go beyond the sixth grade, but the record indicates that during this period of about two years he devoted himself to his studies and made considerable progress. The petitioner is now twenty-seven years of age.

Since the completion of his business college work the petitioner has endeavored to obtain employment both from the Warren Foundry Company and from various other employers in the vicinity of Phillipsburg, New Jersey, and Easton, Pennsylvania. Mr. Churchman, the principal and proprietor of Churchman Business College, and Mr. Patrick Deignan of the New Jersey rehabilitation commission, who had charge of his rehabilitation, made a great effort to obtain employment for the petitioner but were unable to do so, on account of the serious physical handicaps from which he suffered, as the result of the loss of his arm and part of his leg.

At the time of the hearing it appeared that the petitioner had not been able to obtain any employment of any character whatever.

There are two questions before me for determination in this proceeding, the first being as to whether the petitioner is entitled to be paid compensation for his temporary disability which I find extended from the time of the accident for a period of forty-three weeks.

In the case of *Vishney* v. *Empire Steel and Iron Co.*, 87 *N. J. L.* 481 (at *p.* 483); 95 *Atl. Rep.* 143, the Supreme Court, in discussing the subject of temporary disability, held that "temporary disability is a condition that exists until the injured workman is as far restored as the permanent character of the injuries will permit. An apt illustration is a case where there has been a loss of both arms. The temporary disability to be considered in such an instance is the physical state of the patient, until the stumps are healed and he is able to get about; * * *."

Applying this test to the petitioner, the evidence indicates that he is entitled to be paid compensation for temporary disability for the period of forty-three weeks, from the time of the accident. The respondent's insurance carrier admits that this compensation has not been paid, its explanation therefore being, that since this was a case of total permanent disability, the petitioner was not entitled to be paid compensation for temporary disability also. The practice of the workmen's compensation bureau of this state, however, is so well settled to the contrary that I deem it unnecessary to discuss the question further. The rule is that the injured employe who has suffered permanent total disability, is entitled to be paid compensation for temporary disability on the same basis as an employe whose injuries were not so serious, subject to the test above set forth. The petitioner is entitled to be paid compensation for temporary disability for the period of forty-three weeks at $17 per week.

The second issue in the case is more involved and will require more extended discussion. This is as to whether the petitioner is entitled to have his compensation payments for total permanent disability continued after April 20th, 1934, when they ceased.

The section of the statute which determines the solution of this problem is 11 (b) which is as follows (*Pamph. L.* 1911, *ch.* 95, as amended by *Pamph. L.* 1923, *ch.* 49, *p.* 101; *Cum. Supp. Comp. Stat.* 1911-1924, *p.* 3872, § **236-11 (b), I have underscored the parts of the statute which in my judgment are particularly significant:

"* * * This compensation shall be paid for a period of four hundred weeks, at which time compensation payments shall cease unless the employe shall have submitted to such physician or educational rehabilitation as may have been ordered by the Rehabilitation Commission of the State, *and can show that because of such disability it is impossible for him to obtain wages or earnings equal to those earned at the time of the accident, in which case further weekly payments shall be made during the period of such disability;* the amount thereof to be the previous weekly compensation payment diminished by that portion thereof *that the wage, or earnings, he is then able to earn, bears to the wage received at the time of the accident.* In calculating compensation for this extension beyond four hundred weeks the minimum provision of eight dollars shall not apply. This extension of compensation payments beyond four hundred weeks shall be subject to such periodic reconsiderations and extensions as the case may require, and shall apply only to disability total in character and permanent in quality, and shall not apply to any accident occuring prior to July fourth, nineteen hundred and twenty-three."

There is no dispute in this case but that the petitioner has duly submitted himself to such physical and educational rehabilitation as has been ordered by the rehabilitation commission of this state.

It is earnestly contended by counsel for the petitioner in their brief that the theory of the legislature in a situation such as this, was that at the expiration of the period of four hundred weeks or sometime thereafter, a reconsideration of the case would be had, due to the fact that even if the employe was totally and permanently disabled as a matter of law, as is the petitioner, it might have been possible for the rehabilita-

tion commission to rehabilitate him in some ingenious fashion, so that he would be able to obtain some wages or earnings.

The petitioner's contention further is that when this rehabilitation has been completed and if the employe is able, as the result thereof, to help himself and earn a little money, the plan was for the employer to get some of the benefit of this rehabilitation in the form of some decrease in the compensation rate. That on the other hand it was clearly intended that where it was not possible to rehabitate the employe, or where even if he had been rehabilitated, it was impossible for him to obtain any wages or earnings, that then the compensation payments should continue for the rest of his life.

Counsel for the petitioner further argue that the underlying purpose of this scheme was to provide a system such that when the employe was unable to earn anything and therefore it became a question as to whether the taxpayers or industry should be responsible for his care and support, that industry should be compelled to continue to carry the burden since industry was directly responsible for his incapacity.

On the other hand, counsel for the respondent presents a different theory. Counsel admits in his brief that the petitioner has been unable to secure a position. It is contended, however, that inasmuch as there was some testimony to the effect that Hulbert had been qualified by his business college course for the work of a junior bookkeeper, the rate of pay for which is $15 per week, that he has therefore established a theoretical earning capacity, and that consequently, his compensation rate should be reduced under the provisions of section 11 (b) above set forth.

The difficulty with this theory is that there is nothing in the statute nor in sound reason to justify its adoption, and I am therefore unable to do so.

In my opinion, a reading of the statute makes the intention of the legislature clear beyond any question, namely, that before any reduction in the compensation rate can take place, it must appear that the employe is gainfully employed and that he is actually earning wages of some amount.

The statute reads, "and can show that because of such disability it is impossible for him to obtain wages or earnings equal to those earned at the time of the accident." In my opinion the statutory language used here clearly contemplates the receipt of actual wages or earnings and not some more potential earning capacity.

This view is further strengthened by the clauses that immediately follow the above quotation in the statute, "in which case further weekly payments shall be made during the period of disability; the amount thereof to be the previous weekly compensation payment diminished by that portion thereof *that the wage or earnings he is then able to earn, bears to the wage received at the time of the accident.*" It is highly significant in my opinion that here again the statute makes no reference to earning capacity as such, but refers solely to the actual wages or earnings that he is able to earn.

Moreover, it is obvious that under the act, in order to compute the amount of the reduction of the compensation rate, the actual wages then earned by the employe is a necessary factor in the formula. In the present case, however, this element is entirely lacking because he has not earned wages. There is, therefore, nothing upon which to base such a reduction.

I am convinced that if the legislature had intended that the test should be that of a mere theoretical or potential earning capacity, it could easily have said so. On the contrary, since it has so definitely made the test that of the actual wages earned, if any, I am therefore constrained to adopt the latter construction of this statute.

The wisdom of the legislature in making this the test is apparent from the situation that existed in this case, where the great difference between a theoretical and an actual earning capacity is apparent by reason of the fact that despite all of the extraordinary efforts made by the petitioner and others in his behalf, to secure employment for him, it was impossible to do so. It is apparent, from the evidence, that whatever his theoretical earning capacity might be, if any—from a practical standpoint, he has none.

It appeared that the petitioner himself had applied to some eleven firms in the vicinity of Phillipsburg and Easton for work as a clerk, but was refused a job by all of these concerns, and in most instances because of his injuries.

Patrick Deignan, the vocational examiner of the rehabilitation commission, testified that he had interviewed some seven employers in an effort to get the petitioner a job but was unable to do so because of the latter's physical condition. He was not even able to induce the Warren Foundry Company itself to take him back, although at that time the company had a position open for him, the reason being that the company was unwilling to take the chance of his being injured again. It is also very significant that Deignan tried to induce several firms to employ him for a training or "try-out" period without the obligation of paying him any wages, but none of them would accept him even on this basis.

Likewise, Mr. Churchman was unable to get him employment because of the general objection by employers to his physical condition, despite the fact that Churchman made a special effort to locate a position for him.

Various representatives of the National Re-employment office of Warren county testified also that Hulbert had been registered for employment with that office since December 15th, 1933, but that they had failed to get any position for him due to his disability. They agreed with Deignan and the director of the National Re-employment Service office of Hunterdon county, that from a practical standpoint, it was impossible for the petitioner to obtain any wages or earnings; that he was not able to earn any wages and was unemployable on account of his serious physical disability. The testimony on this point was overwhelming.

In this situation, the question arises as to whether the legislature intended that industry should continue to support this man, who is the victim of our modern system of industry, by means of compensation payments until it is possible for him to earn enough wages to take care of himself, or whether he shall become a burden on society and the taxpayers. It is my opinion that the first of these two alternatives is the one

that is far more consonant with the purposes of the Workmen's Compensation act, and I adopt that conclusion.

This viewpoint is further strengthened by the respondent's own witness, Joseph Spitz, the assistant director of the New Jersey rehabilitation commission, who testified that under the definition of "rehabilitation," in use by the New Jersey commission and the federal authorities and also practically all of the states of this country, an injured man is not considered to be rehabilitated until he is remuneratively employed, and that furthermore as soon as he ceases to be so employed he is no longer considered to be rehabilitated but drops back into the class of unrehabilitated cases.

It therefore appears that the rehabilitation authorities are virtually unanimous in the view that mere theoretical earning capacity is not enough, but that the work of rehabilitation is not complete until the individual is able to obtain, and keep a remunerative position.

Both Spitz and Deignan agreed that the petitioner has not been fully rehabilitated because he has not been able to obtain any remunerative employment.

It will thus be perceived that we are dealing with the interpretation of a statute, the whole theory of which is postulated upon the idea that the employe may be restored to some earning capacity by the process of rehabilitation. Furthermore, under the well settled definition of "rehabilitation" we find that, in order to be rehabilitated, a man must have acquired an *actual* earning capacity rather than one that is merely *theoretical*.

In the light of this situation, the only logical conclusion is that under section 11 (b) (*Cum. Supp. Comp. Stat.* 1911-1924, *p.* 3872, § **236-11 (b) the legislature intended that the employe should be remuneratively employed before there can be any reduction in his compensation rate.

The final argument of counsel for the respondent was that the real reason that the petitioner was unable to obtain a job and earn some money, was the lack of opportunity for employment, due to the depression. While I am not convinced that this factor enters in the situation at all, neverthe-

less, it is unnecessary to decide this question inasmuch as the record is replete with the testimony to the effect that it was due to his physical disability rather than to the depression, and I so find.

The question which has been presented to me in this case is one of novel impression in this state. A similar situation, however, is presented in certain other states where the test under the statutes, as to total and permanent disability, is as to whether the injured employe is able to obtain any wages. The question has arisen in this connection as to whether a theoretical earning capacity was intended by such a statute, or actual earnings.

In the case of *Reilly* v. *Carroll* (*Conn.*), 147 *Atl. Rep.* 818, the employe sustained an injury to the left eye. He was able to do some work but could obtain only temporary jobs for short intervals and then only infrequently. The court held that he was entitled to an award of total permanent disability, the test being as to whether he was able to obtain employment. The language of the court is peculiarly apt to the instant case, page 819:

"The object of our statute was to give compensation for a total or partial loss *of the capacity to earn wages.* * * * If * * * the injured employe by reason of his injury is unable in spite of diligent efforts to obtain employment, *it would be an abuse of language to say that he was still able to earn money, that he still had a capacity for work, even though his physical powers might be such as to enable him to do some kinds of work if practically the labor market were not thus closed to him.* * * *"

A somewhat similar situation existed in the case of *Olson* v. *Triplett* (*Ky.*), 75 *S. W. Rep.* (*2d*) 367. Here it appeared that although the employe could perform some light work as a carpenter, he was not able to do all kinds of carpenter work, and therefore could not obtain any employment. The court held that he was totally and permanently disabled, and based its decision upon the following reasonings:

"*It is well settled that 'total disability' does not mean absolute helplessness or entire physical disability.* It means

loss of earning power as a workman, in consequence of the injury, whether the loss manifested itself in inability to perform such work as may be obtainable *or inability to secure work to do.* *Consolidation Coal Co.* v. *Crislip,* 217 *Ky.* 378; 289 *S. W. Rep.* 270. In the Crislip case, *supra,* it was held that an injured employe is 'totally disabled' when he is disqualified from performing the usual tasks of a workman *in such a way as to enable him to procure and retain employment.* Conceding, without deciding, that Triplett is able to perform some light work as a carpenter, *yet it is common knowledge that he would find difficulty in obtaining employment as a carpenter unless he was physically able to discharge ALL the duties ordinarily expected and required of a carpenter."*

A slightly different set of facts existed in *Fennell's Case (Mass.),* 193 *N. E. Rep.* 885. Here the employe sustained such an injury to one eye that it was very apparent that he had only one effective eye, and he finally got to the point where no one would employ him on this account. Despite the fact that admittedly he could do a great deal of work, the Massachusetts court came to the conclusion that the real test did not stop there but included the question as to whether he could obtain employment, and held that since he could not do so, he was entitled to an award of total permanent disability. It is thus apparent that the courts above referred to have refused to adopt the test of a theoretical or potential earning capacity, and hold that the determining factor is as to whether the employe is actually able to obtain employment. If, as in these cases, it is impossible for him to get a job, then he is held to be totally and permanently disabled, under those statutes.

It is obvious that the very same reasoning is directly applicable to the interpretation of section 11 (b), *supra,* of our act, where the legislature prescribed as the test, the actual ability to get a job and earn wages.

On this aspect of the case, my conclusion therefore is, that it is impossible for the petitioner to obtain any wages or earnings, and he is not able to earn any wages, and that

therefore he is entitled to be paid compensation at the rate of $17 per week beginning as of April 20th, 1934, and continuing until the order accompanying this opinion is modified in accordance with the provisions of section 11 (b), *supra*.

JOHN J. STAHL,
*Deputy Commissioner.*